■ In the Matter of RUDOLPH W. GIULIANI, as Mayor of the City of New York, et al., Appellants-Respondents, v ALAN G. HEVESI, as Comptroller of the City of New York, Respondent-Appellant, et al., Nonparty Intervenor. [715 NYS2d 12] —Judgment, Supreme Court, New York County (William Davis, J.), entered April 13, 2000, which denied petitioners' motion for a preliminary injunction and dismissed a CPLR article 78 proceeding to compel respondent to register two welfare-to-work contracts awarded by petitioner Human Resources Administration (HRA) to nonparty Maximus, Inc., and also denied respondent's cross-petition to annul the Mayor's directive that the contracts be registered, unanimously modified, on the law, the petition granted, respondent directed to register the contracts, and otherwise affirmed, without costs.

In 1999, in the wake of Federal welfare reform legislation, New York City consolidated within its Human Resources Administration several previously existing employment training and placement programs for welfare recipients. With existing contracts set to expire on June 30 of that year, there was a desire to complete the consolidation plan as quickly as possible. Accordingly, an express method for soliciting and negotiating new contracts was chosen as an alternative to the standard method of soliciting competitive sealed proposals. Under the standard competitive sealed proposal procedure (Rules of New York City Procurement Policy Board [PPB Rules (9 RCNY)] § 3-03), an agency would have been required to circulate a Request for Proposals (RFP) along with numerous required formalities. The express Negotiated Acquisition process (PPB Rules § 3-04) dispenses with many of these formalities.

In May 1999 HRA invited over 700 organizations to submit applications for a Skills Assessment and Placement (SAP) program and/or an Employment Services and Placement (ESP) program and also advertised these openings in the appropriate media. Criteria were listed, but not weighted, as would have been the case with the RFP process. An informational meeting was attended by 125 interested organizations. HRA received for the two programs a total of 73 applications, which were reviewed by experienced evaluators who invited 38 qualified applicants for interviews. Five applicants were subsequently recommended for SAP contracts, and thirteen for ESP. One of the latter group withdrew during negotiations. Public hearings were then held, and in January 2000 HRA submitted three of the contractors to respondent for registration, a procedure whereby the latter sets aside funds for specific contracts. On February 2, respondent rejected the contracts on the ground, *inter alia*, that HRA had failed to justify use of the Negotiated Acquisition process. HRA then resubmitted the three original contracts for registration, along with 14 others. On March 13, respondent's Deputy for Claims and Contracts formally objected to the registration of all 17, pursuant to New York City Charter § 328 (c), on the ground of corruption, specifying that in letting these contracts, (a) HRA had failed to meet the legal requirements for use of the Negotiated Acquisition process; (b) Maximus, the winner of one SAP and one ESP contract, had repeatedly been granted exclusive access to, and information from, HRA; and (c) Maximus had misrepresented its connection with Opportunity America, an entity whose chief executive officer was a former senior adviser to the Mayor. Three days later the Director of the Office of Contracts set forth the Mayor's disagreement with respondent's conclusions, overrode the objections, and directed respondent to register the contracts within 10 days. Respondent thereupon conceded the Mayor's authority and bowed to the request with respect to 15 of the contracts, but refused to register the two contracts awarded to Maximus. In addition to the reasons already stated, respondent added the additional ground that Maximus had failed to disclose its involvement in a 1996 Federal criminal investigation in West Virginia concerning a State employee who was alleged to have provided Maximus with confidential information regarding a contract proposal. The Mayor's office replied that investigation into all of these well-publicized allegations revealed that Maximus was never involved in any wrongdoing. When respondent still refused to register the Maximus contracts, petitioners commenced this article 78 proceeding in the nature of mandamus.

We agree with the IAS Court's ruling that once the Mayor overrode respondent's objections, the City Charter imposed a mandatory duty upon the Comptroller to register the contracts and deprived him of any further right to challenge. That being the case, the court erred in failing to grant the petition for mandamus. Section 328 (c) of the City Charter provides that the Comptroller may object to the registration of a contract if he suspects corruption, but once the Mayor responds to those objections in writing, indicating his disagreement, the Mayor "may require registration of the contract despite the comptroller's objections. Such response by the mayor shall not serve as the basis for further objection by the comptroller, and the comptroller shall register the contract within ten days of receipt of the mayor's response." Under normal circumstances, the Comptroller need not register a contract where he suspects corruption (*see, e.g., Matter of Garrison Protective Servs. v Office of Comptroller of City of N. Y.*, 92 NY2d 732), but once the Mayor chooses to override those objections, the Comptroller must carry out the mandatory function. The legislative history of this provision of the Charter confirms that conclusion.

This is not to say that the court may not retain some discretion in determining the equities of issuing a mandamus, but in this instance the IAS Court abused its discretion. In the first place, petitioners were fully justified in utilizing the express alternate process of Negotiated Acquisition. There was no evidence of favoritism by the use of this process, and indeed, respondent waived any objection to the process when he registered 15 of the 17 contracts awarded thereby.

There was no evidence that Maximus was afforded unfair access to HRA during the Negotiated Acquisition process. The only contacts between Maximus and HRA were of a general nature consisting of permissible preliminary discussions and Maximus's submission of broad outlines and bullet statements of general goals, in exchange for statistical data already available to all prospective contractors. None of these contacts could be characterized as inside "negotiations" toward the award of a contract.

Respondent's allegation that Maximus had concealed its relationship with Opportunity America is without merit. The fact that Maximus listed Opportunity America as a major subcontractor, rather than as a 30% partner, is of little support to the allegation of concealment.

With regard to the West Virginia Federal investigation, Maximus was never a "subject" of the inquiry, and was never charged with any criminal wrongdoing or conspiracy in connec-

tion therewith. The record reveals that Maximus cooperated fully with prosecutors and waived its Fifth Amendment privilege in connection with that investigation. Indeed, it was Maximus that had blown the initial whistle on the employee in question, unaware at the time that he was also a State employee.

Under the circumstances, the IAS Court should have mandated respondent to carry out his duty under the Charter. Concur—Rosenberger, J. P., Nardelli, Mazzarelli, Wallach and Rubin, JJ.